KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
MATAN SHACHAM - # 262348
mshacham@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
SPENCER MCMANUS - # 322824
smcmanus@keker.com
LIAM BROWN - # 347518
liambrown@keker.com
FLORA D. MORGAN - # 359733
fmorgan@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant
LINKEDIN CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KIMBERLY JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No. 5:25-cv-08100-EJD<br><br>**DEFENDANT LINKEDIN CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: March 19, 2026<br>Time: 9:00 a.m.<br>Dept.: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila<br><br>Date Filed: September 24, 2025<br><br>Trial Date: None Set |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. LinkedIn provides its advertising partners with tools to run marketing campaigns, including through the Insight Tag. ........ 3

B. LinkedIn requires advertisers to comply with the LinkedIn Ads Agreement, which prohibits advertisers from transmitting sensitive data to LinkedIn. ........ 4

C. LinkedIn discloses to users that advertising partners may collect, use, and share user data with LinkedIn through pixel trackers. ........ 4

D. Nevada Health Link asks users certain optional questions and discloses that certain information about its users will be collected. ........ 6

E. Plaintiff tethers her privacy claims to threadbare allegations. ........ 7

III. ARGUMENT ........ 9

A. LinkedIn lacked the requisite intent because it prohibited Nevada Health Link from transferring health data via the Insight Tag and reasonably expected the Nevada government to follow its own laws. ........ 9

B. Plaintiff's claims against LinkedIn fail because Nevada Health Link disclosed and obtained her consent to receive her user information and merely used the Insight Tag as a tool to accomplish the disclosed collection. ........ 12

C. Plaintiff's Federal Wiretap Act claim fails because the one-party consent rule applies, and she otherwise fails to plead the elements of the claim. ........ 15

1. LinkedIn is exempt from liability under the one-party consent rule. ........ 15

2. Plaintiff fails to plead the elements of a Federal Wiretap Act claim. ........ 15

D. Plaintiff fails to state a claim for intrusion upon seclusion under Nevada law. ........ 18

1. The Nevada Supreme Court has never applied the tort to cover the provision of advertising technology like the Insight Tag. ........ 18

2. Plaintiff cannot plausibly plead an objectively reasonable expectation of privacy under the circumstances. ........ 19

3. LinkedIn's conduct was not highly offensive to a reasonable person. ........ 20

IV. CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Community.com, Inc.*,
2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) .......... 16

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) .......... 1, 17

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .......... 1, 2, 9, 15

*Doe v. Eating Recovery Ctr., LLC*,
2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) .......... 16

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) .......... 10

*Esparza v. Gen Digital, Inc.*,
2024 WL 655986 (C.D. Cal. Jan. 16, 2024) .......... 17

*Flores-Figueroa v. United States*,
556 U.S. 646 (2009) .......... 9

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) .......... 13, 15

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 15

*Hammerling v. Google LLC*,
2022 WL 17365255 (N.D. Cal. Dec. 1, 2022) .......... 17

*Hammerling v. Google LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) .......... *passim*

*Hays v. LinkedIn Corp.*,
No. 5:25-cv-04181-EJD (N.D. Cal.) .......... 8

*King v. Hard Rock Café Int'l (USA), Inc.*,
2025 WL 1635419 (E.D. Cal. June 9, 2025) .......... 18

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) .......... 16

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025) .......... *passim*

*M & R Inv. Co. v. Mandarino*,
103 Nev. 711 (1987) .......... 19

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 16

*PETA v. Bobby Bersoni, Ltd.*,
111 Nev. 615 (1995) .......... *passim*

*Pyankovska v. Abid*,
65 F.4th 1067 (9th Cir. 2023) .......... 2, 15

*Rodriguez v. Google LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022) .......... 17

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. June 5, 2024) .......... 15

*Silver v. Stripe*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 15

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 2, 12, 15

*Smith v. Google LLC*,
735 F. Supp. 3d 1188 (N.D. Cal. 2024) .......... 9

*Swarts v. Home Depot, Inc.*,
689 F. Supp. 3d 732 (N.D. Cal. 2023) .......... 17

*Torres v. Prudential Financial, Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .......... 16

*United States v. Chemical Foundation*,
272 U.S. 1 (1926) .......... 11

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......... 9

**Statutes**

18 U.S.C. § 2511 .......... *passim*

Cal. Pen. Code § 630 *et seq*. .......... 16

**Other Authorities**

Fed. R. Civ. Proc. 8 .......... 2, 11, 12

Fed. R. Civ. Proc. 9(b) .......... 2, 11, 12

## LINKEDIN'S NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 19, 2026 at 9:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Edward J. Davila, in Courtroom 4 of the Robert F. Peckham Federal Building and United States Courthouse, located at 280 South First Street, San Jose, California 95113, Defendant LinkedIn Corporation ("LinkedIn") will and hereby does move to dismiss the complaint filed by Plaintiff Kimberly Johnson ("Plaintiff" or "Johnson") in its entirety and with prejudice for failure to state a claim against LinkedIn under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This motion is based on this Notice of Motion, the following memorandum of points and authorities, LinkedIn's concurrently filed request for judicial notice and the supporting declaration of Spencer McManus ("McManus Decl.") and the exhibits attached thereto, all pleadings and papers on file or to be filed in this action, counsel's arguments, and any other matters properly before the Court.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff accuses LinkedIn of violating federal criminal law and Nevada tort law because Nevada Health Link, the state government's health exchange, placed LinkedIn's Insight Tag on its website. In many ways, this lawsuit is just another in the long line of "pixel" cases that have flooded this District, many of which have been dismissed on the pleadings. *See, e.g.*, *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 840–42 (N.D. Cal. 2024) (lack of intent); *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *11 (N.D. Cal. Oct. 10, 2025) (consent); *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1001 (N.D. Cal. 2024) (no real-time interception). But Plaintiff's complaint contains pleading defects that make it even weaker than the average pixel case, including in comparison with the related Insight Tag cases previously considered by this Court.

To start, Plaintiff targets a website run by a ***government actor***—which, it was reasonable to presume, would operate its website not only within its agreements with LinkedIn but also within its own state laws. Even more clearly than in earlier Insight Tag cases, materials Plaintiff herself cites in her complaint show that ***Nevada Health Link***, not LinkedIn, chose to use the Insight Tag and decided where to place the Tag on its website. Plaintiff also affirmatively relies on the LinkedIn Ads Agreement, in which LinkedIn explicitly (1) disclaims intent to collect health information, and (2) instructs advertisers not to use the Tag on pages that collect it. Furthermore, this case involves a website form where the questions soliciting health information were ***purely optional***. Plaintiff provides no well-pleaded allegations that she answered these optional questions during the time when the Insight Tag was allegedly used on the website.

Plaintiff's two claims, which she brings under the Electronic Communications Privacy Act (the "Federal Wiretap Act") and Nevada common law, fail as a matter of law. The reasons for dismissal are multiple and overlapping.

***Lack of intent.*** Plaintiff's claims must be dismissed because she has failed to plausibly plead—and cannot plead—that LinkedIn knowingly and intentionally invaded her privacy, as required for each of her claims. The article from *The Markup* and the Ads Agreement that Plaintiff incorporates into her complaint make clear that it was Nevada Health Link, not

LinkedIn, that controlled where to place the Tag and that LinkedIn expressly instructed Nevada Health Link not to place the Insight Tag on pages that would result in transmission of sensitive data. Plaintiff's conclusory statements to the contrary about LinkedIn's intent push her complaint squarely into the realm of fraud, but she has not and cannot meet either Rule 8 or Rule 9(b) and show that LinkedIn secretly wanted Nevada Health Link to contravene the Ads Agreement. In other words, "[t]he takeaway from these allegations is that [LinkedIn] purposefully acted so as *not* to receive any personal health information." *Doe I*, 741 F. Supp. 3d at 840.

***Consent.*** Plaintiff's entire action also fails because the data practices she complains about were disclosed to her. Plaintiff has failed to plausibly plead facts regarding what sensitive information she allegedly submitted, especially given the fact that numerous questions on Nevada Health Link's online enrollment form are ***optional***. In other words, at most, some generic website interaction data may have been collected from Plaintiff. Without well-pleaded factual allegations, the only plausible conclusion is that Plaintiff experienced exactly what Nevada Health Link discloses in its Privacy Policy: that it would collect certain types of user data during the enrollment process, and that it would further collect data regarding page views and browsing behavior. LinkedIn's disclosures also informed Plaintiff that third parties may collect data about her website interactions using the Insight Tag. These disclosures of the complained-of practices doom both of Plaintiff's claims, which require a lack of consent. *See, e.g.*, *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal of privacy claims based on disclosures in privacy policy); *Hammerling v. Google LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (same).

***Federal Wiretap Act***. Plaintiff's federal wiretapping claim must be dismissed because the Act is a one-party consent statute. *Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023). Plaintiff's own allegations and materials incorporated into the Complaint by reference and subject to judicial notice establish that Nevada Health Link installed the Insight Tag on its website and thus consented to the collection and sharing of communications through its website. This claim also fails because Plaintiff failed to plausibly plead the elements of a Federal Wiretap Act claim—that LinkedIn intentionally intercepted any contents of her communications with Nevada

Health Link while in flight.

***Nevada common law invasion of privacy.*** Plaintiff's Nevada common law claim for intrusion upon seclusion fares no better. As an initial matter, the Nevada Supreme Court has never applied the tort to cover the type of conduct alleged in this case. Here, LinkedIn at most offered a commonplace tool that marketers can choose to use and place on their public websites. Such routine commercial activity is a far cry even from intrusion claims the Nevada Supreme Court has ***rejected***. *PETA v. Bobby Bersoni, Ltd.*, 111 Nev. 615, 634 (1995) (rejecting intrusion claim involving the surreptitious videotaping of an animal trainer in an allegedly private backstage area). In any event, Plaintiff again fails to plausibly plead the elements of that claim: that LinkedIn committed a "highly offensive" intrusion on any "objectively reasonable expectation of privacy." To the contrary, Plaintiff cannot plead that Nevada Health Link's use of a third-party tool to accomplish collection of data that it disclosed to its users amounts to any intrusion, much less a highly offensive one.

All told, Plaintiff seeks to hold LinkedIn liable under a federal criminal statute and expand the reach of Nevada tort law by assuming intent with no facts and by ignoring the disclosures to which she agreed in Nevada Health Link's and LinkedIn's policies. Her claims should be dismissed with prejudice.

## II. BACKGROUND

### A. LinkedIn provides its advertising partners with tools to run marketing campaigns, including through the Insight Tag.

LinkedIn is a social network with a professional focus that helps its members find the right jobs, create and strengthen professional relationships, and learn skills to succeed in their careers. Compl. ¶ 2; McManus Decl. Ex. G. In addition, LinkedIn offers advertising and marketing tools through its Marketing Solutions services. Compl. ¶ 4 n.1. Using these services, an advertiser can direct their advertisements to LinkedIn's members so that those members receive advertisements relevant to their interests. *Id.* ¶ 4.

LinkedIn's "Insight Tag" is a code snippet, offered through its Marketing Solutions services, that advertisers can add to their websites to help optimize ad campaigns for visitors of

their websites. Compl. ¶¶ 4, 37. Advertisers control the implementation of the Insight Tag on their websites: they choose whether to install the Tag at all, and, if so, where and on which pages to do so. Advertisers install the Tag themselves or ask a third-party tag manager to add the Tag to their website; and they can choose to install the Tag as a "first-party cookie," which means it is stored directly in their websites' domain and is thus "offered by the website being visited." *Id.* ¶ 4 n.1; McManus Decl. Ex. H. After installation, the Tag uses cookies to transmit limited data about users' interactions with that website to LinkedIn, which plaintiff alleges LinkedIn can use to match a user with targeted advertising. Compl. ¶¶ 4 n.1, 36–37; McManus Decl. Ex. H.

### B. LinkedIn requires advertisers to comply with the LinkedIn Ads Agreement, which prohibits advertisers from transmitting sensitive data to LinkedIn.

Before advertising with LinkedIn, an advertiser must agree to the LinkedIn Ads Agreement, which governs LinkedIn's relationship with its advertisers. Compl. ¶ 56 & n.14; McManus Decl. Ex. E. The Ads Agreement ***prohibits*** advertisers from sending sensitive information to LinkedIn via the Insight Tag:

> You will . . . not transfer to LinkedIn any data that you know or reasonably should know . . . constitutes Sensitive Data, including by . . . installing the Insight Tag on a page that collects medical, financial, or other Sensitive Data about identified or identifiable individuals.

*Id.* "Sensitive Data" is defined to include any "data concerning health or sexual orientation." *Id.*

In addition to the Ads Agreement terms, LinkedIn also instructs advertisers to "never add" the Insight Tag to website "pages that collect or otherwise handle health, financial, or other sensitive data of individual users" in its description of the Insight Tag. Compl. ¶ 4 n.1; McManus Decl. Ex. H. LinkedIn repeats that admonition in the "LinkedIn Insight Tag FAQs": the "Insight Tag should not be installed on web pages" that offer "specific health-related . . . services . . . to consumers." McManus Decl. Ex. I.

### C. LinkedIn discloses to users that advertising partners may collect, use, and share user data with LinkedIn through pixel trackers.

Plaintiff alleges that she has a LinkedIn account. Compl. ¶ 12. All LinkedIn members, in creating an account, are required to agree to LinkedIn's User Agreement, Privacy Policy, Cookie

Policy, and Cookie Table. Plaintiff incorporates into her complaint quotations from numerous LinkedIn disclosures and policies—*see, e.g.*, *id.* ¶¶ 4 n.1, 55 n.13, 56 n.14—but omits the detailed disclosures about LinkedIn's privacy and advertising practices that she agreed to when signing up for LinkedIn and that are in multiple instances contained in the very same documents she cites.

LinkedIn's **User Agreement** provides that use of LinkedIn's services is subject to agreement to the User Agreement, the Privacy Policy, and the Cookie Policy, which detail "the collection, use, and sharing of [the user's] personal data," including services related to the Insight Tag. McManus Decl. Ex. A.

LinkedIn's **Privacy Policy** includes a section entitled "Cookies and Similar Technologies," which states that LinkedIn "use[s] cookies and similar technologies (e.g., pixels and ad tags) to collect data . . . to recognize you and your device(s) on, off and across different services and devices where you have engaged with [LinkedIn's] Services." McManus Decl. Ex. B § 1.4; *see also id.* § 2.4 (stating that LinkedIn targets ads to members using "[d]ata collected by advertising technologies on and off [LinkedIn's] Services using pixels, ad tags, . . ., cookies, and other device identifiers"). The Privacy Policy further and explicitly states that LinkedIn "receive[s] information about your visits and interaction with services provided by others when you log-in with LinkedIn or visit others' services that include some of [its] plugins . . . or our ads, cookies or similar technologies." *Id.* § 1.8. Finally, the Privacy Policy provides a link to controls on LinkedIn that allow a user to "opt out . . . from [LinkedIn's] use of data from cookies and similar technologies that track [a user's] behavior on the sites of others for ad targeting and other ad-related purposes." *Id.* § 1.4.

The LinkedIn **Cookie Policy** provides even further details regarding LinkedIn's data collection. The Cookie Policy reiterates that LinkedIn uses "cookies and similar technologies such as pixels . . . to collect and use data as part of [LinkedIn] Services." McManus Decl. Ex. C. It describes a pixel as a "tiny image that may be embedded within web pages and emails" that LinkedIn uses "to learn more about your interactions with email content or web content, such as whether you interacted with ads or posts." *Id.* The Cookie Policy states the pixels are used to help LinkedIn "show relevant advertising to you more effectively," including by "learn[ing]

whether content has been shown to you or whether someone who was presented with an ad later came back and took an action . . . on another site," and refers back to the Privacy Policy for more information. *Id.*

Finally, LinkedIn's **Cookie Table**, discussed and linked in the Cookie Policy, specifically discloses LinkedIn's Insight Tag. McManus Decl. Ex. D. That table lists "cookies that we and third parties place" and provides "information about the cookies that LinkedIn uses on third party sites including when LinkedIn's Insight Tag is installed on our customers' sites." *Id.* Likewise, in its section "Cookies LinkedIn drops on third party sites," LinkedIn states that it "enables third party sites to include some of its services such as Insight Tag." *Id.* These cookies include "lms_ads" and "li_sugr" cookies, each of which can be used to attempt to identify LinkedIn members off LinkedIn for advertising. *Id.*; *cf.* Compl. ¶¶ 36–37 (discussing certain of the cookies in the Cookie Table).

### D. Nevada Health Link asks users certain optional questions and discloses that certain information about its users will be collected.

Nevada Health Link is a website created by the Silver State Health Insurance Exchange, Nevada's state agency formed in response to the Affordable Care Act, to help Nevadans find health insurance plans. McManus Decl. Ex. J1 (Nevada Health Link – "About"). To gather information about available health plans, a Nevadan can use the website to fill out enrollment forms online, in paper, via phone, or using a local vendor. *See* McManus Decl. Exs. J2 (paper application), J3–J8 (online enrollment pages). In the online form, applicants provide some basic information about their ZIP code, what year they want to be covered for, and their income level to determine if they qualify for lower premiums. McManus Decl. Ex. J3. The online enrollment form also asks four expressly "Optional" questions, including one about what prescription drugs the applicant uses to "see if they are covered by your plan." McManus Decl. Ex. J5. The article from *The Markup* on which Plaintiff bases her complaint focuses on one such "Optional" question regarding medication. McManus Decl. Ex. L at 3. But applicants do not need to provide any information about medication—or any other health information—before signing up for a Nevada Health Link account and viewing healthcare plan options. McManus Decl. Ex. J3.

Like LinkedIn, Nevada Health Link discloses on its public website that it will collect certain information about website visitors and their interactions with the website. Nevada Health Link's **Privacy Policy** discloses its collection of user information. McManus Decl. Ex. K. Under a large purple heading entitled "Collection of Information," Nevada Health Link describes how it collects information "during the application process, enrollment, customer support, and renewals." *Id.* Nevada Health Link lists different types of data that it collects from its users, including the following:

- **Demographic Data**: Name, Address, Phone Number, Email, Age
- **Income Data**: Tax Filing Status, Marriage Status, Tax Dependents, Employer, Annual or Monthly Income
- **Citizenship Data**: Social Security Number, Resident Alien Number, Native American Tribe ID Number, Incarceration Status
- **Disability Information**: Whether the application/household member is blind, disabled, or requires assistance with daily living . . .
- **Payment Information**: Credit Card Numbers, Checking Account Numbers
- **Health Insurance Coverage Information**: Past and current health insurance coverage, tobacco use, consumer plan selections, and other information necessary to facilitate enrollment.

*Id.* Nevada Health Link also discloses that "some data regarding page views, browsing behavior, and system response times may also be collected." *Id.*

Visitors to the Nevada Health Link website who complete an enrollment form are required to agree to the Privacy Policy (which is also linked at the bottom of every page). After users proceed through the enrollment form by entering personal information and selecting a health plan, they are asked to create an account before submitting their information. A user cannot submit the form until they check a box next to the phrase "I have read and agree to the Privacy Policy," where "Privacy Policy" is a hyperlink to the page containing the Policy. McManus Decl. Ex. J8.

**E. Plaintiff tethers her privacy claims to threadbare allegations.**

Plaintiff's complaint follows the same blueprint as many others asserting claims against service providers for website operators' deployment of commonplace internet technology. As in those complaints, Plaintiff conclusorily alleges that LinkedIn intercepted electronic

communications "without her consent," despite acknowledging that she is a LinkedIn member who thus consented to the disclosures in LinkedIn's User Agreement, Privacy Policy, and Cookie Table. Compl. ¶¶ 12, 47, 50. And as with other complaints, she handwaves without any specific factual support that LinkedIn utilized information it allegedly intercepted to "generate highly profitable targeted advertising." *E.g.*, *id.* ¶¶ 9–10.

But Plaintiff's complaint here is particularly deficient with respect to any allegations specific to her interactions with the website at issue.[1] She fails to allege when exactly she accessed Nevada Health Link's website, saying only that she first used the site sometime in 2019 and then again visited the site on an unspecified date in 2024. Compl. ¶ 12. Plaintiff thus never alleges that she submitted her information during the time period that Nevada Health Link allegedly used the Insight Tag on its site. *See id.* ¶ 21 (alleging that Nevada Health Link used the Insight Tag on its site from February 2024 to May 2025).

She also fails to allege any well-pleaded facts about what information she submitted to Nevada Health Link's website. In the section of the complaint describing the "unlawful interception of her PHI while using the Website," Plaintiff alleges only that she "filled out forms" and "provided sensitive health information." *Id.* ¶¶ 44, 46. Elsewhere in the complaint, Plaintiff vaguely alleges that she "submitted her medication and dosage information Nevada Health Link [*sic*]." *Id.* ¶ 12. Notably, that allegation merely parrots the language from the one (optional) question cited in *The Markup* article. *See* McManus Decl. Ex. J5 at 3 ("medication [names] and dosages"); *see also id.* Ex. L at 1–2 (*Markup* article referencing the same "(Optional)" question about medication). Regardless, Plaintiff does not allege when (during the period Nevada Health Link used the Insight Tag on its website?) and how (via the forms alleged in her complaint?) she

[1] Indeed, the complaint appears to be a copy-and-paste job of another lawsuit filed against LinkedIn involving a different healthcare exchange. The complaint in this case contains a stray reference to Covered California, the California health exchange that is not at issue here but is at issue in *Hays v. LinkedIn Corp.*, No. 5:25-cv-04181-EJD (N.D. Cal.), brought by the same counsel. Compl. ¶ 111.

submitted such information.

Nor does Plaintiff allege facts plausibly showing that LinkedIn used any information collected from her. Her generalized allegations about targeted advertising are untethered to her—she does not allege that LinkedIn used her information to generate targeted advertising, nor that she saw any such advertising on LinkedIn, Nevada Health Link's website, or any other platform.

Based on her cookie-cutter allegations, Plaintiff contends that LinkedIn violated the Federal Wiretap Act and committed Nevada common law invasion of privacy. Compl., Counts I–II. She seeks to represent a nationwide class of all people "who exchanged communications with the Nevada Health Link website . . . or any of its subpages on which the Insight Tag operated and who had their [personal health information] captured." *Id.* ¶ 76.

## III. ARGUMENT

### A. LinkedIn lacked the requisite intent because it prohibited Nevada Health Link from transferring health data via the Insight Tag and reasonably expected the Nevada government to follow its own laws.

Plaintiff's claims require that LinkedIn knowingly and intentionally obtained her data without authorization and used it for an improper purpose. *See United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (the Federal Wiretap Act requires that "the defendant acted intentionally, that is, purposefully and deliberately and not as a result of accident or mistake"); *PETA*, 111 Nev. at 630, 634 (Nevada common law requires an "intentional intrusion" and considers "motive" of alleged tortfeasor). In cases against software service providers like this one, Ninth Circuit precedent requires "something more than mere awareness that an interception might occur." *Doe I*, 741 F. Supp. 3d at 840 (characterizing *Christensen*, 828 F.3d at 790). After all, the Federal Wiretap Act is a criminal statute and thus imposes a *mens rea* requirement of "guilty knowledge," which must be satisfied as to each element. *Flores-Figueroa v. United States*, 556 U.S. 646, 658 (2009). When a company like LinkedIn requires its advertising partners to avoid sharing with it sensitive user information using its software, that company cannot have the requisite knowledge and intent necessary for a violation of a criminal statute. *Doe I*, 741 F. Supp. 3d at 842; *but see Smith v. Google LLC*, 735 F. Supp. 3d 1188, 1198 (N.D. Cal. 2024); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023).

As part of the LinkedIn Ads Agreement,[2] LinkedIn conditioned Nevada Health Link's use of the Insight Tag on its agreement to "not transfer to LinkedIn any data that [Nevada Health Link] know[s] or reasonably should know . . . constitutes Sensitive Data, including by way of installing the Insight Tag on a page that collects medical, financial, or other Sensitive Data about identified or identifiable individuals." McManus Decl. Ex. E. LinkedIn repeats this admonition frequently, both on its "Insight Tag" page for its "Market Solutions" services, as well as in its Insight Tag FAQs. McManus Decl. Exs. H–I. Given this admonition, LinkedIn could not have intended to collect through the Insight Tag any health data that Plaintiff claims she provided to Nevada Health Link.

This Court previously considered the import of the Ads Agreement in different but related cases. *See L.B.*, 2025 WL 2899514, at *11–13 (order on motions to dismiss in five Insight Tag cases). The Court concluded that based on the allegations in those cases, the Ads Agreement and other LinkedIn advertising policies were not "entirely dispositive of intent at the pleadings stage" but that plaintiffs' allegations created only a "relatively weak" inference of intent "in light of LinkedIn's policies to the contrary and the absence of specific facts concerning how LinkedIn uses the data it allegedly receives from the Insight Tag." *Id.* at *13.

For several reasons, Plaintiff's allegations here do not create even a "weak" inference that LinkedIn intended for the advertiser to act contrary to the Ads Agreement. ***First***, Plaintiff cites and relies upon (and indeed, borrows her allegations from) an article in *The Markup* that makes clear that Nevada Health Link—not LinkedIn—had the sole prerogative to choose which webpages bear the Insight Tag and thus control what data is then transmitted through the Insight Tag. *See* Compl. ¶ 7 & n.4; McManus Decl. Ex. L. Plaintiff pleads no facts establishing any action by LinkedIn in placement of the Tag on the Nevada Health Link website (nor could she).

---

[2] This document is publicly available at https://www.linkedin.com/legal/sas-terms, applies to Nevada Health Link's conduct as an advertiser with LinkedIn, and governs LinkedIn's Marketing Solutions services, as described in Plaintiff's complaint. *See* Compl. ¶ 56 & n.14; McManus Decl. Ex. E.

Plaintiff's claims are thus expressly based on ***Nevada Health Link*'s** alleged installation of the Insight Tag on pages that handle health-related information, and not on any independent action taken by LinkedIn.

***Second***, and unlike in the previous series of Insight Tag cases, this case involves actions allegedly taken by a government entity. Under the well-established principle of presumption of regularity, LinkedIn was entitled to presume that Nevada Health Link, as a government actor, acted within its own laws when it placed the Insight Tag on its own website. *See United States v. Chemical Foundation*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Plaintiff pleads no facts overcoming that presumption, much less facts showing that any criminal or tortious intent could be imputed to LinkedIn from Nevada Health Link's choice to transmit any health-related data (Plaintiff's or otherwise) from its website.

***Finally***, by citing and making allegations about the Ads Agreement in her complaint, Plaintiff's complaint crosses the boundary into alleging that "LinkedIn's admonitions to advertisers are false or misleading," such that her allegations "trigger the heighted pleading requirements of Federal Rule of Civil Procedure 9(b)." *L.B.*, 2025 WL 2899514, at *13 n.10. Here, even more so than in previous cases, Plaintiff expressly relies on the Ads Agreement to allege that LinkedIn requires advertisers to have "obtained valid consent" to transmit their data to LinkedIn. (True.) Compl. ¶ 56. Thus, she has incorporated into her complaint the other statements in the Ads Agreement prohibiting advertisers from transferring Sensitive Data (including "data concerning health") to LinkedIn or from placing the Insight Tag on pages that might collect that information. McManus Decl. Ex. E. By alleging that LinkedIn intentionally acquired Plaintiff's health data, but also affirmatively incorporating by reference the portions of the Ads Agreement expressly disclaiming such intent, Plaintiff is claiming that the statements in the Ads Agreement are fraudulent misrepresentations. *L.B.*, 2025 WL 2899514, at *13 n.10.

The allegations in Plaintiff's complaint to support this claim do not satisfy Rule 8, much less Rule 9(b). She devotes only four paragraphs to her attempt to plead intent. *See* Compl.

¶¶ 39–43. The first two state bare legal conclusions that LinkedIn was "keenly aware," or at least "should have known" that it was receiving personal health information through Insight Tag. *Id.* ¶¶ 39–40. The remaining three make allegations regarding enforcement actions or settlements involving ***other companies***, not LinkedIn, and thus are irrelevant to LinkedIn's intent. *See id.* ¶¶ 41 (Flo Health), 42 (Meta), 43 (GoodRx, Monument). None of these allegations plausibly plead that LinkedIn's express statements in the Ads Agreement are fraudulent, or that LinkedIn actually desires for advertisers to flout its Ads Agreement and admonitions. Plaintiff's conclusory allegations regarding LinkedIn's intent, which lack any support from well-pleaded facts, fail to satisfy even Rule 8 plausibility requirements, much less Rule 9(b).

Taken together, Plaintiff's allegations do not create even a "relatively weak" inference of intent that barely survived in previous cases. *L.B.*, 2025 WL 2899514, at *13. Plaintiffs' claims should be dismissed for this reason alone.

**B. Plaintiff's claims against LinkedIn fail because Nevada Health Link disclosed and obtained her consent to receive her user information and merely used the Insight Tag as a tool to accomplish the disclosed collection.**

Both of Plaintiff's claims against LinkedIn require her to establish that she did not consent to Nevada Health Link collecting the information at issue. *See* 18 U.S.C. § 2511(2)(d) (interception "shall not be unlawful . . . [where] one of the parties to the communication has given prior consent to [the] interception"); *Smith*, 745 F. App'x at 9 ("Knowing authorization of the practice constitutes Plaintiffs' consent."); *Hammerling*, 2024 WL 937247, at *3 (no reasonable expectation of privacy where Privacy Policy disclosed collection of data).

The Ninth Circuit has consistently affirmed the dismissal of privacy claims when plaintiffs do not adequately plead lack of consent, particularly where terms of service, privacy policies, or related disclosures describe the practices at issue. *See, e.g.*, *Smith*, 745 F. App'x at 9 (affirming dismissal of California state law claims where the practice complained of "f[ell] within the scope of [p]laintiffs' consent to Facebook's Terms and Policies"); *Hammerling*, 2024 WL 937247, at *3 (affirming dismissal of privacy claim where privacy policy "expressly disclosed Google's intention to track their activity on third-party apps"). A court can consider disclosure and consent issues on a motion to dismiss privacy claims. *L.B.*, 2025 WL 2899514, at *13;

*Hammerling*, 2024 WL 937247, at *3 (affirming dismissal on this basis); *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (dismissing CIPA claim for failure to adequately allege lack of consent).

Unlike in *L.B.*, in which the Court found plausible allegations regarding the type of information required in each website form and alleged to be submitted, *see* 2025 WL 2899514, at *6–7, Plaintiff here has failed to provide plausible facts regarding a purported submission of information to Nevada Health Link. She never alleges that she submitted information to Nevada Health Link during the time when it allegedly used the Insight Tag on its site. *See* Compl. ¶¶ 12 (alleging that she first used the website sometime in 2019 and then again visited in 2024), 21 (alleging that Nevada Health Link used the Insight Tag on its site only from February 2024 to May 2025). She also fails to allege any well-pleaded facts about what information she submitted on Nevada Health Link's website, alleging only conclusorily that she "filled out forms" and "provided sensitive health information." *Id.* ¶ 46. At most, she parrots *The Markup* article by alleging that she "submitted her medication and dosage information Nevada Health Link [*sic*]." *Id.* ¶ 12; McManus Decl. Ex. L at 2 ("medication [names] and dosages"). But she fails to allege when (during the period of time the Insight Tag was allegedly active or not) or how (via the website or paper form) she submitted such "mediation and dosage information." This failure is especially stark given that questions about an applicant's medication are ***optional*** in the Nevada Health Link submission form. *Id.* Ex. J5 (showing an "Optional" question about medication); *see also id.* Ex. L at 1–2 (*Markup* article referencing the same "Optional" question about medication). Plaintiff has thus failed to allege sufficient facts regarding any submission of information to Nevada Health Link.

Without plausible allegations of what information she submitted, the only reasonable inference is that Plaintiff submitted some generic website interaction data to Nevada Health Link, the collection of which was exactly what Nevada Health Link and LinkedIn disclosed would occur in their policies. Regardless, if Plaintiff in fact submitted her information through the form on Nevada Health Link's website, then she affirmatively agreed to the Nevada Health Link Privacy Policy. That Policy discloses the "[c]ollection of [i]nformation," including demographic

data, income data, citizenship data, disability information, and health insurance coverage information, "during the application and enrollment process." McManus Decl. Ex. K. The Privacy Policy also states that Nevada Health Link collects certain "data regarding page views [and] browsing behavior" regarding visitors to its website. *Id.* That Nevada Health Link utilizes a third-party tool (the Insight Tag) to accomplish these collections does not transform practices disclosed in its Privacy Policy into criminal or tortious acts. Indeed, the article from *The Markup* that Plaintiff cites makes clear that the Insight Tag is a tool placed by the advertiser—Nevada Health Link—to accomplish the disclosed collection of information. *See* McManus Decl. Ex. L (quoting a Nevada Health Link executive describing the Insight Tag as a "tracker[] placed by his Nevada agency"); *id.* (quoting the same executive as saying that Nevada Health Link had "disabled [its] tracking software pending an audit").

LinkedIn too discloses that the Insight Tag is a tool that advertisers can use to collect information from website users. LinkedIn expressly discloses the use of the Insight Tag in its Cookie Table, which is incorporated into its Cookie Policy, explaining clearly and unambiguously how it operates and what information it collects. McManus Decl. Ex. C. LinkedIn discloses that it "use[s] cookies and similar technologies (e.g., pixels and ad tags) to collect data . . . to recognize you and your device(s) on, off and across different services and devices where you have engaged with [LinkedIn's] Services," and that it "receive[s] information about your visits and interaction with services provided by others" when those sites contain LinkedIn's "ads, cookies or similar technologies." McManus Decl. Ex. B at §§ 1.4, 1.8; *see also id.* Ex. C (LinkedIn uses "cookies and similar technologies such as pixels . . . to collect and use data as part of [LinkedIn] Services"). Thus, Plaintiff was on notice of the fact that a website operator could use the Insight Tag to collect information related to her website interactions and browsing behavior—*i.e.*, filling out forms. *See* Compl. ¶ 46.

Because these disclosures include the alleged data practices of which Plaintiff has plausibly complained, both of her claims should be dismissed with prejudice. *See, e.g.*, *L.B.*, 2025 WL 2899514, at *13; *Smith*, 745 F. App'x at 9; *Silver v. Stripe*, 2021 WL 3191752, at *5 (N.D. Cal. July 28, 2021); *Hammerling,* 2024 WL 937247, at *3; *Garcia*, 78 F. Supp. 3d at 1136;

*see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020).

### C. Plaintiff's Federal Wiretap Act claim fails because the one-party consent rule applies, and she otherwise fails to plead the elements of the claim.

#### 1. LinkedIn is exempt from liability under the one-party consent rule.

The consent of one party is a complete defense to liability under the Federal Wiretap Act. 18 U.S.C. § 2511(2)(d) (not unlawful to intercept a "communication" where "one of the parties to the communication has given prior consent"); *see also Pyankovska*, 65 F.4th at 1074 (noting that the Act is a "one party" consent statute). Materials cited in the complaint confirm that Nevada Health Link was the one that placed the Tag on its own website and controlled its operation. For example, the article from *The Markup* that Plaintiff relies upon makes clear that the Insight Tag is a tool placed by the advertiser—Nevada Health Link—to accomplish the collection of information. *See* Compl. ¶ 4 & n.7; McManus Decl. Ex. L (quoting a Nevada Health Link executive describing the Insight Tag as a "tracker[] placed by his Nevada agency"). When the "alleged interception of private health information only occurs because the health care providers cho[se] to install [LinkedIn] source code on their web properties," then "[t]his must mean the providers consented to the operation of [LinkedIn] source code." *Doe I*, 741 F. Supp. 3d at 842. Because Plaintiff concedes that Nevada Health Link consented to sharing data it collects from its users by affirmatively embedding the Insight Tag into its website, and Nevada Health Link is a receiving party to any data it collects, the Federal Wiretap Act claim should be dismissed without leave to amend. *See Roe v. Amgen Inc.*, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (concluding that plaintiff's Federal Wiretap Act claim was "barred pursuant to the one-party consent provision" when defendant, "as the creator and operator of its website, consented to the use of data collection tools it installed on its website").

#### 2. Plaintiff fails to plead the elements of a Federal Wiretap Act claim.

To plead a Federal Wiretap Act claim, Plaintiff must show that LinkedIn "(1) intentionally (2) intercepted (3) the contents of (4) plaintiff[']s electronic communications (5) using a device." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 794–95 (N.D. Cal. 2022) (citing *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003)). Plaintiff's Federal Wiretap Act claim fails for

the independent reason that she fails to plead the requisite elements.

***Not intentional.*** As described above, Plaintiff has failed to plausibly plead that LinkedIn had the intent to invade her privacy by intercepting her information. *See supra* Section III.A.

***No interception.*** Under the Federal Wiretap Act, interception must occur during the "transmission" of a communication. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002). This requirement is analogous to the "in transit" requirement under the California Invasion of Privacy Act (CIPA), Cal. Pen. Code § 630 *et seq*. *Adler v. Community.com, Inc.*, 2021 WL 4805435, at *4 (C.D. Cal. Aug. 2, 2021) (analyzing CIPA "in transit" and Wiretap Act "transmission" requirements together). As courts have found in the context of that statute, this requires a contemporaneous attempt to read a communication ***while it is in transit*** from plaintiff to Nevada Health Link. *See Torres v. Prudential Financial, Inc.*, 2025 WL 1135088, at *5–7 (N.D. Cal. Apr. 17, 2025) (in transit requirement not satisfied when the communications were intercepted and then stored on a server because the company didn't read or attempt to read the communications "while they were in transit"); *Doe v. Eating Recovery Ctr., LLC*, 2025 WL 2971090, at *5 (N.D. Cal. Oct. 17, 2025) (in transit requirement not satisfied where communications were intercepted, filtered, and stored because there was no attempt to read them while in transit). Plaintiff fails to plead any facts meeting this statutory element. Indeed, her complaint includes only conclusory statements that Plaintiff's communications with Nevada Health Link are "simultaneously intercepted and transmitted to LinkedIn." Compl. ¶ 34; *see also id.* ¶¶ 28, 32, 80, 93, 95 ("contemporaneously"). Those bare legal allegations merely recite the statutory requirement that information be intercepted during transmission, and the inclusion of "simultaneously" or "contemporaneously" does not make interception any more plausible.

Thus, without facts supporting her conclusory allegations, Plaintiff has failed to plead that LinkedIn intercepted any of her information while it was in transit. *See L.B.*, 2025 WL 2899514, at *16 (allegation that interception took place in "real time" implausible because it "d[id] not provide fair notice of exactly when or how [defendant] intercepted the communications"); *Esparza v. Gen Digital, Inc.*, 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024) (no plausible allegation of in transit interception where plaintiff "merely restated the pleading requirement of

real time interception" and "fail[ed] to allege specific facts about what was intercepted, when the interception took place, and how the interception took place"); *Cody*, 718 F. Supp. 3d at 1001 (rejecting the allegation that the intercepted communication was "first routed through [the defendant's servers]" as too "vague" to establish "how the software works or how the interception occurs"); *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 746 (N.D. Cal. 2023) (same because the allegations "do[] not indicate *when* the interception occurs . . . [and] does not dispel the notion that [the third party] receives the information 'after the chat reaches [the first party]'"); *Hammerling v. Google LLC*, 2022 WL 17365255, at *10 (N.D. Cal. Dec. 1, 2022) (allegations of "real-time data" collection were insufficient to plausibly allege in transit data collection); *Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) (rejecting allegations that a defendant "logs the data, and sends a second copy to itself, even when it is not supposed to," and concluding that "[u]sing the word 'intercept' repeatedly is simply not enough without . . . specific facts that make it plausible [defendant] is intercepting [plaintiff's] data in transit").

***No contents.*** Plaintiff provides no plausible allegations that LinkedIn intercepted the "contents" of any of her communications with Nevada Health Link. As discussed above, although Plaintiff alleges that she "submitted her medication and dosage information Nevada Health Link [*sic*]," Compl. ¶ 12, that allegation appears to be a generalized allegation parroted from *The Markup* article, *see* McManus Decl. Ex. L at 3. If anything, the materials incorporated by reference into the complaint show that questions about an applicant's medication are ***optional*** when an applicant is creating an account with Nevada Health Link. McManus Decl. Ex. J5 (showing an "(Optional)" question about medication); *see also id.* Ex. L at 1–2 (*Markup* article referencing the same "(Optional)" question about medication). And Plaintiff does not ever say she submitted this information through the website as opposed to in a paper application. *See* Compl. ¶¶ 44–50 (describing Plaintiff's use of the website and not mentioning medication or dosage). But even accepting that Plaintiff in fact submitted "medication and dosage information" to Nevada Health Link on its website, she fails to plausibly allege she did so during the time period she alleges the Insight Tag was active on the website. By her own allegations, this may have occurred in 2019 or in 2024—***before*** Nevada Health Link allegedly implemented the Insight

Tag. *See id.* ¶ 21 (alleging that Nevada Health Link used the Insight Tag on its site from February 2024 to May 2025). Plaintiff thus offers no plausible allegations regarding the contents of her communications. *See King v. Hard Rock Café Int'l (USA), Inc.*, 2025 WL 1635419, at *4–5 (E.D. Cal. June 9, 2025) (insufficient allegations of interception of "contents" on hotel website where plaintiff only alleged she submitted "guest records" but failed to "identify with specificity what information she provided on [the] [w]ebsite that was intercepted by [the third party]").

Given that Plaintiff fails to plausibly plead these elements of a Federal Wiretap Act claim, the claim must be dismissed.

**D. Plaintiff fails to state a claim for intrusion upon seclusion under Nevada law.**

Plaintiff also asserts a Nevada common law claim for invasion of privacy based on intrusion upon seclusion. But the Nevada Supreme Court has never extended this tort to cover commonplace internet activity like LinkedIn's provision of the Insight Tag tool to marketers or Nevada Health Link's choice to use the Insight Tag. And in any case, Plaintiff cannot plausibly plead a highly offensive intrusion on an objectively reasonable expectation of privacy that is required to state a claim.

**1. The Nevada Supreme Court has never applied the tort to cover the provision of advertising technology like the Insight Tag.**

Nevada law sets a high bar for an intrusion claim. "The *Restatement* [of Torts], upon which th[e Nevada Supreme Court] has previously relied for guidance in this area, formulates the tort of intrusion in terms of a physical invasion upon the 'solicitude or seclusion' of another, the rationale being that one should be protected against intrusion by others into one's private 'space' or private affairs." *PETA*, 111 Nev. at 630 (quoting Restatement (Second) of Torts § 652B). Indeed, the primary Nevada cases considering this tort rejected even claims made by individuals who were filmed or photographed without their consent. For example, the Nevada Supreme Court in *PETA* rejected an intrusion claim brought by an animal trainer who was surreptitiously videotaped in his allegedly private backstage area while he was "disciplining" the animals he was about to perform with, which videotape was then distributed to the public with commentary that the trainer "regularly abused" the animals by "beat[ing] them with steel rods." *See id.* at 618,

631–32. The Nevada Supreme Court similarly rejected an intrusion claim brought by an individual who entered "a public gaming establishment" in disguise and whose undisguised photo was captured and distributed by the casino after confiscating his winnings and accusing him of counting cards. *M & R Inv. Co. v. Mandarino*, 103 Nev. 711, 718–19 (1987). If these cases did not state claims for intrusion upon seclusion, Plaintiff's alleged intrusion claim falls far short of the bar.

For one, the intrusion alleged here is not one effectuated upon physical space. The tort aims to protect "place[s] traditionally associated with a legitimate expectation of privacy," like a "private bedroom . . ., hospital room . . ., a restroom . . ., or in a young ladies' dressing room." *PETA*, 111 Nev. at 634–35 (citations omitted). But even setting aside the traditional thrust of the tort, the conduct alleged here is far afield even from the alleged intrusion claims the Nevada Supreme Court has rejected: LinkedIn offers the Insight Tag as a tool to website operators and discloses its functionality to LinkedIn members like Plaintiff, and Nevada Health Link used the Insight Tag to collect electronic data from a public website and told its users it was collecting that data. The conduct alleged here amounts at most to commonplace internet activity; the claims in the cases the Nevada Supreme Court rejected alleged surreptitious taping of behavior that was highly embarrassing to the plaintiff when disclosed. Plaintiff's attempt to expand the bounds of Nevada common law to cover routine commercial conduct should be rejected.

**2. Plaintiff cannot plausibly plead an objectively reasonable expectation of privacy under the circumstances.**

Plaintiff cannot plead an objectively reasonable expectation of privacy under the circumstances, as is required to establish an intrusion upon her seclusion. *PETA*, 111 Nev. at 630. "The extent to which seclusion can be protected is severely limited by the protection that must often be accorded to freedom of action and expression of those who threaten th[e] seclusion of others." *Id.* at 631. Much like "it is no invasion of privacy to photograph a person in a public place," *id.*, it was no invasion of privacy that a tool that Nevada Health Link deployed on its public website accomplished a collection of information that Nevada Health Link disclosed would occur.

Plaintiff was on notice via Nevada Health Link's Privacy Policy that Nevada Health Link would collect information about her on its public website, including information about her page views and browsing behavior. McManus Decl. Ex. K. Plaintiff herself cites the Privacy Policy in her complaint, Compl. ¶¶ 53–54 & nn.11–12, and to the extent she in fact submitted any information to Nevada Health Link through enrollment forms, she would have been required to accept the Privacy Policy. McManus Decl. Ex. J8. That Nevada Health Link chose to use a tool to collect that information could not plausibly have come as a surprise. Plaintiff was likewise on notice of LinkedIn's disclosures to its members that the Insight Tag is a tool that customers use on their websites to collect information about their website interactions. *Id.* Exs. B, C, F.

Moreover, if Plaintiff in fact submitted information about her medication and dosage information on the website, she did so in response to questions that were explicitly marked as "Optional.". *See id.* Ex. J5 (showing "(Optional)" question about medication); *see also id.* Ex. L at 1–2 (*Markup* article referencing the same "(Optional)" question). Her choice to answer these optional questions on a website renders her stated expectation of privacy implausible.

Plaintiff has thus failed to plead any reasonable expectation of privacy. *Cf. Hammerling*, 2024 WL 937247, at *3 (disclosure in privacy policy precluded invasion of privacy claims under California common law).

**3. LinkedIn's conduct was not highly offensive to a reasonable person.**

Nor can Plaintiff plausibly plead that LinkedIn's conduct was highly offensive to a reasonable person. *PETA*, 111 Nev. at 630. "[T]here is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion." *Id.* at 634 (citations omitted). "A court considering whether a particular action is 'highly offensive' should consider the following factors: 'the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.'" *Id.* (citations omitted). None of these factors suggest a highly offensive intrusion in this case.

***Motive and objective.*** There are no well-pleaded facts that LinkedIn had any motive at all

regarding Plaintiff's Nevada Health Link data, much less a motive to intrude upon Plaintiff's privacy. "Many courts . . . have found the inquiry into motive or purpose to be dispositive of this particular element of the tort." *PETA*, 111 Nev. at 635. That is likewise the case here. As described above, Plaintiff has failed to plead any facts showing that LinkedIn had any motive at all regarding her information, much less a tortious one. *See supra* Section III.A. She has alleged no facts showing that LinkedIn was responsible for placing the Insight Tag on any of Nevada Health Link's webpages or that it had any secret intent to receive Plaintiff's health information in contravention of the admonitions in its Ads Agreement. Nor has Plaintiff plausibly pled that LinkedIn had any monetary motive with respect to Plaintiff's information—her complaint is devoid of any allegations that LinkedIn served her with any targeted advertising. To the extent that any "motive" can be gleaned from Plaintiff's bare allegations, that motive is not LinkedIn's, nor is it a motive to intrude upon her seclusion specifically. At most, all that Plaintiff has pled is that LinkedIn provided the Insight Tag as a tool that the implementing customer uses for its own purposes—and here, that implementor was Nevada Health Link, whose actions LinkedIn was entitled to believe were consistent with the presumption of regularity. That is not the motive required by Nevada common law.

***Expectation of privacy.*** As discussed above, Plaintiff has failed to plausibly plead a reasonable expectation of privacy under the circumstances. *See supra* Section III.D.2.

***Degree of intrusion and conduct.*** The alleged degree of intrusion here is minimal. Even accepting Plaintiff's not-well-pleaded allegations that she submitted medication dosage information to Nevada Health Link, the collection of a small amount of information on a public website does not suggest a high degree of intrusion. If anything, the decision to submit medication dosage information on a public website in response to ***optional*** questions confirms that any intrusion was at most minimal. Moreover, ad tags and pixel technologies are commonplace on the internet, as are retargeted ads based on prior browsing activity (which Plaintiff does not even allege that she received).

***Context, circumstances, and setting.*** None of these three factors weigh in favor of finding the alleged conduct highly offensive either. All of the allegations involve activity on a

public website, run by an entity that disclosed that it would be collecting user data. Nevada Health Link disclosed that it would collect certain types of user data, and its use of LinkedIn's Insight Tag to accomplish that goal is hardly surprising or highly offensive. McManus Decl. Ex. K. Furthermore, LinkedIn disclosed that its Insight Tag might be used on third-party websites to collect data, and Plaintiff assented to that disclosure when she signed up for a LinkedIn account. McManus Decl. Exs. A–D. In any event, Plaintiff does not allege facts showing that she received any targeted advertisements at all, much less based on any data collected from use of Nevada Health Link, so any allegations that LinkedIn did more than offer a tool that Nevada Health Link chose to use are implausible.

Because Plaintiff has failed to plausibly plead the elements of a Nevada common law invasion of privacy claim, that claim must be dismissed.

## IV. CONCLUSION

LinkedIn respectfully requests that the Court dismiss this entire action with prejudice, as any amendment would be futile.

Dated: December 17, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Benjamin Berkowitz*
BENJAMIN BERKOWITZ
MATAN SHACHAM
CHRISTINA LEE
SPENCER MCMANUS
LIAM BROWN
FLORA D. MORGAN

Attorneys for Defendant
LINKEDIN CORPORATION