**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN: 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Tel.: (213) 723-0707
Fax: (858) 313-1850

*Attorneys for Plaintiff*
*and Proposed Class Counsel*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KIMBERLY JOHNSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No.: 5:25-cv-08100-EJD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Kimberly Johnson, on behalf of herself and all others similarly situated, asserts the following against Defendant LinkedIn Corporation ("LinkedIn" or "Defendant"), based upon personal knowledge, information and belief where applicable, and the investigation of counsel:

**NATURE OF THE ACTION**

1. Plaintiff brings this case to address Defendant's unlawful practice of intercepting Plaintiff's and Class Members' confidential personal health communications with Nevada Health Link, without their knowledge or consent.

2. LinkedIn is a social networking site that is predominately used for professional networking and career development.

3. Like other social networking platforms—such as Facebook, Snapchat, and TikTok—LinkedIn offers website operators, such as Nevada Health Link, a tracking technology that can be embedded on a website to collect and analyze how individuals interact with a given website.

4. LinkedIn's tracking technology—the LinkedIn Insight Tag ("Insight Tag")—is a snippet of JavaScript computer code embedded on a third-party website that tracks a visitor's actions as they navigate through the website. It logs the URLs of pages they visit, the buttons they click, their IP address, and more.[1] This information is collected in real time and sent to LinkedIn who then utilizes the harvested data to target individuals with advertisements on its social media platform.

5. LinkedIn profits from this large-scale data collection. The Insight Tag is marketed towards businesses that use LinkedIn Ads as a way to "optimize" their advertising campaigns and LinkedIn generates substantial revenue through its advertising services.[2]

6. These benefits appeal to website operators, with over 150,000 websites in the United States utilizing the Insight Tag.[3]

7. Recently, it was discovered that the Insight Tag was embedded on Nevada Health Link's website, https://www.nevadahealthlink.com/ (the "Website"), the organization that lets Nevadans shop for health insurance under the Affordable Care Act.[4]

8. When a visitor to the Website shopped for health insurance, the Insight Tag intercepted sensitive health information, and sent that information to LinkedIn, providing Defendant with intimate personal facts and data in the form of their sensitive health information, such as prescription names and dosages. [5]

9. LinkedIn thereafter monetized the harvested sensitive health information received though the Insight Tag by utilizing it to generate highly profitable targeted advertising; the type of advertising on which it relies for a substantial portion of its revenue.

---

[1] *Insight Tag*, LinkedIn, https://business.linkedin.com/marketing-solutions/insight-tag (last accessed Sep. 16, 2025).

[2] *Id.*, *see also* Nicola Agius, *LinkedIn Ad Prices Surge as Advertisers' X Boycott Continues*, SEARCH ENGINE LAND (Jan. 2, 2024), https://searchengineland.com/linkedin-ad-prices-climb-advertisers-boycott-x-436152.

[3] *LinkedIn Insights Usage Statistics*, BuiltWith, https://trends.builtwith.com/analytics/LinkedIn-Insights (last accessed Sep. 16, 2025).

[4] Colin Lecher and Tomas Apodaca, *We caught 4 more states sharing personal health data with Big Tech*, THE MARKUP (June 17, 2025), https://themarkup.org/pixel-hunt/2025/06/17/we-caught-4-more-states-sharing-personal-health-data-with-big-tech.

[5] *See id*.

10. The targeted advertising LinkedIn offers for sale includes the ability to target individuals based on specific sensitive health information that a visitor has provided to Nevada Health Link.

11. LinkedIn's actions constitute an extreme invasion of Plaintiff's and Class Members' right to privacy and violate federal and state statutory and common law.

**PARTIES**

12. Plaintiff is an adult and citizen of Nevada. She first used the Website in 2019 and most recently used the Website in 2024. While shopping for health insurance, Plaintiff submitted her medication and dosage information Nevada Health Link. Plaintiff has a LinkedIn account.

13. Defendant is a corporation organized under the laws of Delaware with its primary place of business located at 1000 W. Maude Ave, Sunnyvale, California 94085.

**JURISDICTION & VENUE**

14. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this suit is brought under the laws of the United States (18 U.S.C. §§ 2510, *et seq.*).

15. This Court has supplemental jurisdiction over the remaining state law claim pursuant to 28 U.S.C. § 1367 because the state law claim forms part of the same case or controversy under Article III of the United States Constitution.

16. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

17. Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

**FACTUAL BACKGROUND**

18. Nevada Health Link is Nevada's health insurance marketplace that was established under the Affordable Care Act to help Nevadans find and afford health insurance plans. Millions of users visited the Website.[6]

19. Nevada Health Link operates the Website and its subpages.

[6] *June 17, 2025 Marketing Update,* available at https://www.nevadahealthlink.com/wp-content/uploads/2025/06/09A-SSHIX-FY25-REP-JuneBoardReport-2025.pdf (last accessed Sep. 17, 2025).

20. Unbeknownst to Nevadans shopping for health insurance, the Insight Tag was embedded on the Website and its subpages, collecting information Nevadans submitted to Nevada Health Link.

21. Indeed, a recent investigation by The Markup revealed that between February 2024 and May 2025, the Insight Tag was tracking visitors to the Website and disclosing health information submitted to Nevada Health Link to LinkedIn.[7]

**A. How LinkedIn's Insight Tag Works**

22. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accessed web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

23. Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with internet users' client devices via their web browsers.

24. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses. Any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests are a separate type of HTTP Request that can send a large amount of data outside of the URL (*e.g.*, uploading a PDF to a court's ECF system for filing a motion).
- Cookies: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies that have been placed on the client device are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data to the cookie owner's website when the user is visiting an entirely different website.

---

[7] Lecher, *supra* n. 4.

- HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data. HTTP Responses can also send cookies or other code hidden and embedded in the webpage to the client device's browser.

25. When an individual visits the Website, an HTTP Request is sent from that individual's web browser to Nevada Health Link's servers that asks the Website to retrieve certain information. The HTTP Response from Nevada Health Link's servers sends the requested information in the form of "markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the visitor's screen as they navigate the website.

26. Every website is comprised of markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

27. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Insight Tag is source code that does just that, and acts much like a traditional wiretap. When users visit the Website, via an HTTP Request to Nevada Health Link's server, the server sends an HTTP Response including the markup that displays the Webpage visible to the user along with source code that includes Defendant's Insight Tag. Once the Webpage loads in the user's browser, Defendant's Insight Tag quietly waits for a communication from the user to trigger the tag, which intercepts those communications intended only for Nevada Health Link and delivers the content of those communications to Defendant.

28. Defendant's Insight Tag manipulates the web users' browser by secretly instructing it to duplicate the user's communications (HTTP Requests) with Nevada Health Link and to send those communications to LinkedIn. These transmissions occur contemporaneously, invisibly, and without the user's knowledge.

29. The Insight Tag is programmed to automatically track and transmit communications made between Nevada Health Link and its users. The Insight Tag executes instructions that effectively

open a hidden spying window into the user's browser through which LinkedIn can intercept the visitor's data, actions, and communications with Nevada Health Link.

30. The user visiting the Website only sees the markup, not Defendant's Insight Tag or the underlying HTTP Requests and Responses.

31. The inclusion of the Insight Tag on a website does not provide any substantive content to the website user. In other words, LinkedIn does not provide anything to the user but only serves to track user data and communications to further the marketing purposes of the website owner and Defendant (*i.e.*, to bolster profits).

32. Thus, without any knowledge, authorization, or action by a user, LinkedIn uses its Insight Tag source code to commandeer the computing devices of the Website's users, causing the device's web browser to contemporaneously and invisibly re-direct communications to LinkedIn.

33. In this case, LinkedIn intercepted Plaintiff's and Class Members' Personal Health Information ("PHI") to acquire data to power its targeted advertising business.

34. Consequently, when Plaintiff and Class Members visit the Website and communicated their PHI to Nevada Health Link, including, but not limited to, precise text of search queries about specific prescription drugs and dosages; these communications are simultaneously intercepted and transmitted to LinkedIn.

35. LinkedIn tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

36. LinkedIn also uses personally identifiable cookies, such as "li_at" and "li_rm," which contain digitally signed and encrypted records of a user's LinkedIn account.

37. LinkedIn uses cookies like li_at and li_rm to help customize ads on LinkedIn. For example, LinkedIn uses such cookies to remember users' most recent searches, previous interactions with an advertiser's ads or search results, and visits to an advertiser's website. This helps LinkedIn show customized ads to users on LinkedIn.

38. LinkedIn's cookies thus provide personally identifiable data about users who visit the Website and share PHI with Nevada Health Link, and LinkedIn intercepts this information for its targeted advertising purposes.

**B. LinkedIn Was Well Aware that the Intercepted Data Included PHI**

39. By its design of the Insight Tag, *i.e.*, sending all interactions on a website to LinkedIn, Defendant was keenly aware that the Insight Tag would intercept individuals' PHI when embedded on the Website.

40. At minimum, LinkedIn should have known it was receiving PHI through the Insight Tag enabled on the Website given the well-reported issues related to the use of tracking technologies on websites involving sensitive health information.

41. For instance, in 2021, the Federal Trade Commission reached a settlement with Flo Health, Inc., arising from allegations that the fertility-tracking app was sharing sensitive health information from millions of its users with marketing and analytics firms, including Meta and Google.[8]

42. Further, in 2022, investigations from The Markup revealed that hospitals across the country were sharing individuals' health information with Meta via its own tracking technology known as the Meta Pixel.[9]

43. Since then, the Federal Trade Commission has engaged in numerous enforcement actions against companies, including online pharmacy GoodRx and telehealth companies such as Monument for sharing users' health information to Meta and Google without individuals' consent.[10]

**C. Plaintiff Had Her PHI Intercepted by LinkedIn**

44. Plaintiff fell victim to LinkedIn's unlawful interception of her PHI while using the Website.

45. While the Insight Tag was embedded on the Website, Plaintiff visited the Website and related subpages to shop for health insurance through Nevada's health insurance exchange.

---

[8] *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, FTC (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.

[9] Todd Feathers et al., *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[10] Katie Palmer, *FTC Cracks Down on Telehealth Addiction Service Monument for Sharing Health Data*, THE MARKUP (Apr. 19, 2024), https://themarkup.org/pixel-hunt/2024/04/19/ftc-cracks-down-on-telehealth-addiction-service-monument-for-sharing-health-data.

46. When shopping for health insurance through the Website, Plaintiff filled out forms and provided sensitive health information.

47. Unbeknownst to Plaintiff, however, Nevada Health Link had installed the Insight Tag on the Website. This resulted in the interception of Plaintiff's PHI by LinkedIn without her consent.

48. Plaintiff never consented to the interception of her PHI by LinkedIn.

49. Plaintiff reasonably believed that her interactions with Nevada Health Link were private and would not be intercepted by a third-party, let alone utilized for advertising purposes.

50. Plaintiff was dismayed and outraged when she learned that LinkedIn had been capturing her PHI for advertising purposes without her consent.

**D. Defendant's Interception Occurred Without Plaintiff's or Class Members' Knowledge or Consent**

51. Plaintiff and Class Members had no idea LinkedIn collected and used their PHI when they interacted with the Website because the Insight Tag runs only in the background of the Website.

52. For instance, when Plaintiff was on the Website, there was no indication that the Insight Tag was embedded or that it would collect her PHI.

53. Nevada Health Link's "Privacy Policy" states that "[p]ersonally identifiable health information will be created, collected, used, and/or disclosed only to the extent necessary to accomplish the goals of Nevada Health Link" and that Nevada Health Link only used Plaintiff's and Class Members' information "to ensure the efficient operation of the Nevada Health Link, verify the eligibility of an individual to enroll through Nevada Health Link or to claim a premium tax credit or cost-sharing reduction, and the amount of the credit or reduction."[11]

54. Nevada Health Link's Privacy Policy further states that Plaintiff's and Class Members' PHI "will not be shared with any other person or entity unless it is required to determine eligibility or enroll in a QHP/QDP." At no time does the Privacy Policy disclose that individuals' sensitive health information will be disclosed to LinkedIn.[12]

---

[11] *Privacy Policy*, NEVADA HEALTH LINK (effective Mar. 11, 2025), available at https://www.nevadahealthlink.com/about-nevada-health-link/privacy-policy/ (last accessed Sep. 17, 2025).

[12] *Id.*

55. The collection of Plaintiff's and Class members' PHI is also inconsistent with LinkedIn's Advertising Polices. LinkedIn requires those advertising on its platform to "comply[ ] with applicable privacy and data protection laws and regulations" and to not "use tracking cookies to track users across sites without full disclosure and consent of the users."[13]

56. LinkedIn's Ads Agreement similarly requires those advertising on its platform to have "obtained valid consent (to the extent required by Applicable Law) from, the applicable individuals regarding any collection, transfer and use of their Audience Data for Matched Audiences and Analytics and the underlying technologies that enables these services."[14]

57. Neither Plaintiff nor Class Members knowingly consented to LinkedIn's interception of their sensitive health information when using Nevada Health Link's website.

58. Accordingly, Defendant lacked authorization to intercept or use Plaintiff's and Class Members' sensitive health information.

### E. Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their Sensitive Health Information

59. Plaintiff and Class Members have a reasonable expectation of privacy in their information communicated to Nevada Health Link, including their PHI. Specifically, Plaintiff and Class Members had a reasonable expectation that while shopping for health insurance that their sensitive health information would not be intercepted by third parties, such as LinkedIn, without express authorization.

60. As one expert put LinkedIn's surreptitious collection of Plaintiff's and Class Members' sensitive health information: "people don't expect that their health information will be collected and used in this way" and that "[t]his absolutely contradicts the expectation of the average consumer[.]"[15]

61. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations

---

[13] *LinkedIn Advertising Policy*, LINKEDIN (revised Dec. 16, 2024), available at https://www.linkedin.com/legal/ads-policy (last accessed Sep. 17, 2025).

[14] *LinkedIn Ads Agreement*, LinkedIn (updated Jan. 6, 2025), available at https://www.linkedin.com/legal/sas-terms (last accessed Sep. 17, 2025).

[15] Tomas Apodaca and Colin Lecher, *How California Sent Residents' Personal Health Data to LinkedIn*, THE MARKUP (April 28, 2025), https://themarkup.org/pixel-hunt/2025/04/28/how-california-sent-residents-personal-health-data-to-linkedin.

of privacy that have been established as general social norms. Empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records."[16]

62. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

63. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[17]

64. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[18]

65. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies [...] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[19]

66. Many privacy law experts have expressed serious concerns about individuals' sensitive medical information being disclosed to third-party companies like LinkedIn. As those critics have

[16] Sharona Hoffman and Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 Berkley Tech L.J. 1523, 1557 (2009).

[17] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety.

[18] Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.com/story/apple-ios14-facebook.

[19] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER (Jan. 17, 2021), https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth.

pointed out, having an individual's personal health information disseminated in ways the individual is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

67. LinkedIn surreptitious interception and collection of sensitive health information therefore violated Plaintiff and Class Member's privacy interests.

### F. Plaintiff's PHI Has Economic Value and Defendant's Interception Has Caused Economic Harm

68. It is common knowledge that there is an economic market for consumers' personal data, including the kind of data that LinkedIn has collected and disclosed from Plaintiff and Class Members.

69. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[20]

70. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[21] That same article noted that "[d]ata has become a strategic asset that allows [social media] companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[22]

71. Despite the protection afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic Oath.

[20] Emily Steel, *et al*, *How much is your personal data worth?*, FINANCIAL TIMES (updated July 15, 2017), https://ig.ft.com/how-much-is-your-personal-data-worth.

[21] Pauline Glikman and Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data.

[22] *Id.*

Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[23]

72. Further demonstrating the financial value of Plaintiff and Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data.[24]

73. Further, individuals can sell or monetize their own data if they choose. For example, Facebook has offered to pay individuals for their voice recordings,[25] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[26] A myriad of other companies and apps also offer consumers money in exchange for access to their personal data.[27]

74. Given the monetary value that data companies have already paid for personal information in the past, LinkedIn has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by intercepting, collecting, and using, that information without consideration for Plaintiff's and the Class Member's property.

**CLASS ACTION ALLEGATIONS**

75. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

76. Plaintiff seeks certification for the following proposed Class:

---

[23] *See* Aaron Sankin, *Your medical data is for sale, and there's noting you can do about it*, REVEAL NEWS (Jan. 20, 2017), https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it; *see also* Justin Sherman, *Your Health Data Might Be for Sale*, SLATE (June 20, 2022), https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

[24] Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[25] Jay Peters, *Facebook will now pay your for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app.

[26] Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Updated Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html.

[27] *See, e.g.,* Sam Hawrylack, *Apps that Pay You for Data Collection*, CREDITDONKEY (June 12, 2021), https://www.creditdonkey.com/best-apps-data-collection.html; Illia Lahunou, *Can You Earn Money From Your Data? Yes, You Can. And Here's How!*, MONETHA BLOG (Apr. 28, 2022), https://www.monetha.io/blog/rewards/earn-money-from-your-data.

> During the fullest period allowed by law, all persons who exchanged communications with the Nevada Health Link website - https://www.nevadahealthlink.com/ - or any of its subpages on which the Insight Tag operated and who had their PHI captured.

77. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) LinkedIn, LinkedIn's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the LinkedIn or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and LinkedIn's counsel.

78. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery, or pursuant to instruction by the Court.

79. **Numerosity:** Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PHI may have been improperly disclosed to third parties, and the Class is identifiable within Defendant's records.

80. **Commonality and Predominance:** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to Plaintiff and Class Members which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. whether the tracking technology used by LinkedIn is designed to send individually identifiable information from third parties to Defendant;

b. whether LinkedIn intercepted and/or transmitted from third parties the contents of electronic communications between Nevada Health Link and its users without Plaintiff's and Class Members' consent;

c. whether LinkedIn's interception of the contents of electronic communications between Nevada Health Link and its users occurred contemporaneous to their making;

d. whether LinkedIn violated Plaintiff's and Class Members' privacy rights;

e. whether LinkedIn's acts and practices were intentional;

f. whether LinkedIn's acts and practices were negligent;

g. whether LinkedIn profited from obtaining Plaintiff's and Class Members' PHI;

h. whether LinkedIn was unjustly enriched;

i. whether LinkedIn's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

81. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

82. LinkedIn engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

83. **Typicality:** Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their PHI compromised as a result of Defendant's interception of their electronic communications with Nevada Health Link. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are users the Website who transmitted information to Nevada Health Link and are victims of LinkedIn's conduct. All claims of Plaintiff and Class Members are based on LinkedIn's wrongful conduct and unauthorized interception of their communications.

84. **Adequacy of Representation:** Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

85. **Superiority:** Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

## CAUSES OF ACTION

### COUNT I
### Violations Of Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1) *Et Seq*.
### Unauthorized Interception, Use, And Disclosure
### (On Behalf of Plaintiff and the Class)

86. Plaintiff realleges and incorporates by reference paragraphs 1-85 as if fully set forth herein.

87. Plaintiff brings this claim on behalf of herself and all members of the Class.

88. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

89. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

90. The ECPA protects both sending and receipt of communications.

91. **Electronic Communications**. The transmission of PHI between Plaintiff, Class Members, and Nevada Health Link via the Website are "transfer[s] of signs, signals, writing, […] data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

92. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that

communication." 18 U.S.C. § 2510(8). The contents of Plaintiff's and Class Members' communications include, but are not limited to, IP addresses, LinkedIn cookies containing user account information, URLs, file downloads, and the text of search queries, all of which concern substance and meaning of Plaintiff's and Class Members' personal identities and PHI such as prescriptions and dosages.

93. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents […] include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8). Whenever Plaintiff and Class Members interacted with Nevada Health Link, through its Insight Tag source code, Defendant contemporaneously and intentionally acquired the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, *i.e.*, Nevada Health Link.

94. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device […] which can be used to intercept a[n] […] electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. the Insight Tag deployed by Defendant to effectuate the sending and acquisition of patient communications.

95. Whenever Plaintiff and Class Members interacted with Nevada Health Link, through the Insight Tag source code, Defendant contemporaneously and intentionally used, or endeavored to use, the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health insurance services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

96. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

97. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

98. Defendant intentionally used the intercepted communications to increase its profit margins. Defendant specifically used Insight Tags to track and utilize Plaintiff's and Class Members' PHI for financial gain.

99. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

100. Plaintiff and Class Members did not authorize LinkedIn to acquire the content of their communications for purposes of invading their privacy.

101. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

102. Likewise, Nevada Health Link did not fully and actually consent to the sending of sensitive healthcare information of its customers to LinkedIn, as set forth in the LinkedIn Ads Agreement that governs the relationship between Nevada Health Link and LinkedIn where Nevada Health Link purportedly agreed that sensitive customer information would not be sent to LinkedIn. (*See* Dkt. 29, at p. 4). To the extent that sensitive customer information was nevertheless sent to LinkedIn, "organizations that have these massive tech stacks that rely on third party-resources don't have a full understanding of what the configuration is, what the data flows are, and then once they go to somebody, what that data is being used for […] it's something that needs to be addressed." (*See* Dkt. No. 31-23 (https://themarkup.org/pixel-hunt/2025/06/17/we-caught-4-more-states-sharing-personal-health-data-with-big-tech (last visited December 17, 2025)). Therefore, the one-party consent rule does not bar liability under the ECPA. 18 U.S.C § 2511(2)(d).

103. In addition, the ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

104. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

105. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually identifiable health information, such as building informational profiles of users and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members; and

d. the diminution in value of Plaintiff's and Class Members' PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as medical conditions and treatments that Plaintiff and Class Members intended to remain private no longer private.

106. As a result of Defendant's violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

107. Plaintiff realleges and incorporates by reference paragraphs 1-106 as if fully set forth herein.

108. Plaintiff brings this claim on behalf of herself and on behalf of the Class.

109. Nevada common law recognizes a cause of action for intrusion upon seclusion.

110. The PHI of Plaintiff and Class Members consist of private and confidential facts and information that were never intended to be shared beyond private communications.

111. Plaintiff and Class Members had a reasonable expectation of privacy in their sensitive health information.

112. LinkedIn intentionally intruded upon Plaintiff's and Class Members' private life, solitude, or seclusion by intercepting the contents of their communications with Covered California.

113. Plaintiff and Class Members did not consent to, authorize, or know about LinkedIn's intrusion at the time it occurred. Plaintiff and Class Members never agreed that LinkedIn could intercept the PHI they shared with Nevada Health Link.

114. Plaintiff and Class Members had an interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

115. LinkedIn's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy because Plaintiff's and Class Members' sensitive health information is private and was intended to remain private and confidential.

116. Plaintiff and Class Members were harmed by LinkedIn's wrongful conduct as that conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their sensitive health information.

117. As a direct and proximate result of LinkedIn's conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, asks for judgment in her favor, and that the Court enter an order as follows:

A. certifying the Class and appointing Plaintiff as the Class's representative;

B. appointing Plaintiff's counsel as class counsel;

C. finding that LinkedIn's conduct as alleged herein was unlawful;

D. awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining LinkedIn from any further interception of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

E. awarding statutory damages to Plaintiff and Class Members pursuant to 18 U.S.C. § 2520 and Cal. Penal Code § 631;

F. awarding damages for violations of Plaintiff and Class Members' right to privacy;

G. awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

H. awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

I. awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

J. awarding costs of suit; and

K. such other and further relief to which Plaintiff and Class Members may be entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 27, 2026

**LYNCH CARPENTER, LLP**

By: */s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com

Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Tel.: (213) 723-0707
Fax: (858) 313-1850

Nicholas A. Colella*
nickc@lcllp.com
Patrick D. Donathen*
patrick@lcllp.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243

*Attorneys for Plaintiff and Proposed Class Counsel*

* *Pro hac vice* forthcoming